# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNOLD TREVINO,            Petitioner, v. KATHY MENDOZA-POWERS, Warden,            Respondent. | 1:07-cv-00169 LJO DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently represented by Steven Charles Sanders, Esq.

BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following a conviction of second degree murder on April 8, 1987. Petitioner was sentenced to fifteen years-to-life, plus a one year enhancement. In the instant petition, Petitioner does not challenge the validity of his conviction; rather, he challenges the Governor's reversal of the Board of Parole Hearings' 2005 decision finding his suitable for release on parole.

Respondent filed an answer to the petition on May 11, 2007, and Petitioner filed a pro se traverse on July 28, 2008. (Court Docs. 8, 20, 21.)

1

STATEMENT OF FACTS

On September 12, 1986, while attending a party at Ricky Blanton's girlfriend's house, Petitioner got into a physical altercation with Mr. Blanton. Mr. Blanton had the upper hand in the fight and ultimately kicked Petitioner out of the house. Petitioner felt humiliated because people at the party laughed at him. Petitioner told Mr. Blanton that he was going to "get [him]." After Petitioner left the house, he attempted to buy beer but was unable to do so because it was already 2:00 a.m. Petitioner went back to the party by himself because he knew there was beer there. When he arrived, the party was over and nobody was there. The music was still on and he saw Mr. Blanton lying on the couch with his girlfriend, Tara Larson. Petitioner became enraged from the prior incident and ran back to his car and obtained a knife. Petitioner stabbed Mr. Blanton and cut him over the ear which slid down his shoulder. Mr. Blanton jumped up and grabbed Petitioner, the two struggled and Petitioner stabbed him again in the pulmonary artery-resulting in Blanton's death. Petitioner admitted he had used speedballs that day-containing heroin and cocaine, and was drinking alcohol.

(Court Doc. 29, Exhibit B at 10-14.)

DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because

he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), citing White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

In reversing the Board's finding that Petitioner was suitable for release on parole, the Governor found that the circumstances of the commitment offense, alone, was sufficient to find Petitioner unsuitable for release on parole. However, the Governor also cited Petitioner's institutional behavior and prior history in reversing the Board's decision. As to the circumstances of the commitment offense, the Governor stated:

> Mr. Trevino committed a chilling murder. After being thrown out of the party earlier that night, Mr. Trevino returned to Ms. Larson's apartment after her guests had left. Although Mr. Trevino claims that he was simply returning to the apartment to retrieve his beer when he became overcome with emotion, grabbed a knife he had in his car, entered the apartment and began swinging at Mr. Blanton, the record reflects some level of premeditation. About an hour before stabbing Mr. Blanton, Mr. Trevino had threatened "I'll get you, watch out, I'll get you." Then, after the party was over, Mr. Trevino returned to Ms. Larson's home and quietly snuck into the apartment armed with a knife. As Mr. Blanton and his girlfriend slept on the couch, Mr. Trevino approached the victim–who was in a position of extreme vulnerability–and viciously stabbed him in the neck. Once stabbed, Mr. Blanton awoke and the two men struggled. Mr. Trevino then stabbed the already-wounded Mr. Blanton in the chest, eventually killing him. The events

4

> of that day indicate that Mr. Trevino's actions were premeditated on some level, thereby exceeding the minimum necessary for his second-degree murder conviction. Moreover, the manner in which he entered the home and attacked the sleeping victim is horrifying. The gravity of this heinous murder is alone sufficient for me to conclude Mr. Trevino would pose an unreasonable public-safety risk if released from prison at this time.

(Answer, Exhibit 2 at 2-3.) The Governor also noted that Petitioner initially claimed the murder was self-defense but in the mid-1990's he revealed the version of events set forth at the 2005 hearing. The Governor also stated that at the time of the murder Petitioner was a 21-year-old alcoholic and drug abuser, and had suffered prior convictions for public intoxication as a juvenile and driving under the influence as an adult. He pointed out that Petitioner's conduct did not cease immediately upon his arrival in prison. "During the first two years, Mr. Trevino was disciplined for participating in a major physical confrontation on the yard, horseplay, and possession of inmate-manufactured alcohol. In 1994 he also was disciplined for participating in a work stoppage." (Court Doc. 29, Exhibit B, Decision at 2.) It is unclear to what extent, if at all, the Governor relied on these factors in denying parole because he specifically stated that the circumstances of the commitment offense were alone sufficient to deny parole.

In the last reasoned decision of the Tulare County Superior Court, the Court found that the Governor's reversal of the grant of parole based solely on the circumstances of the commitment offense to be supported by some evidence. (Answer, Exhibit 3.) More specifically, the Court stated, "Based upon the gravity of this crime alone, this was sufficient for the Governor to deny parole. Based upon all of the above factors there was "some evidence" of exceptional callous disregard for human suffering by the petitioner that evidenced a finding of individualized viciousness beyond the minimal necessary for second degree murder." (Answer, Exhibit 3 at 2.) (citing In re Dannenberg, 35 Cal.4th 1061, 1098 (2005); In re Rosenkrantz, 29 Cal.4th 616, 683 (2002).

II.     Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for

procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability. Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the

6

> circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required. Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied. See Court Doc. 29, Exhibit B.

Article 5, section 8(b) of the California Constitution, allows the Governor to review the decision of the Board and enables him to affirm, modify, or reverse the decision on the basis of the same factors that the Board is required to consider. See Cal. Const. art. 5, § 8(b); In re Rosenkrantz, 59 P.3d 174, 210 (Cal. 2002). Accordingly, the Governor's decision to reverse a parole grant is reviewed under the same due process principles utilized to review the Board's denial of parole.

The California Supreme Court clarified the standard of the review applicable to parole decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008). The applicable standard "is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a

continuing threat to public safety.

Id. at 1214.[1]

In finding Petitioner suitable for parole, the Board thoroughly considered the gravity of the circumstances of the commitment offense and concluded that Petitioner no longer posed a danger or threat to society if released. The Board considered all of Petitioner's programing citing the following: 1) lack of prior juvenile record assaulting others; 2) stable social history due to stable relationships with others; 3) participation in educational programs, self-help therapy, vocational programs, institutional job assignments, and exemplary institutional behavior.

Both the Governor and Superior Court found that the circumstances of the commitment offense, alone, provided some evidence to deny parole because it demonstrated an exceptionally callous disregard for human suffering. Although the circumstances of Petitioner's commitment offense were indeed egregious, the question before this Court is not "merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." Lawrence, 44 Cal.4th at 1221. Thus, even if there is some evidence to support the Governor's and Superior Court's finding that the commitment offense demonstrated an exceptionally callous disregard for human suffering, it must still be determined if the probative value of immutable offense demonstrates that Petitioner remains a danger to public safety. For the reasons explained *infra*, the Court finds that, when viewed in the light of the evidence before the Board at the 2005 hearing, there is not "some evidence" to support the Governor's or state court's finding that the circumstances of the commitment remain a predicative value of Petitioner's current dangerousness.

The Board found Petitioner has realistic parole plans, including offers of employment and strong family support-six offers of residence and four solid offers of employment. (Court Doc.

---

[1] To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification." In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

8

29, Exhibit B, Decision at 2-3; see 15 Cal. Code Regs. § 2402, subdivision (d)(8) (Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.")

Pursuant to § 2402, subdivision (d)(9), Petitioner has maintained positive institutional behavior indicative of significant improvement of self-control. See 15 Cal. Code Regs. § 2402(d)(9) ("Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.") During his almost eighteen years of imprisonment, Petitioner received a total of four rules violation reports (CDCR 115's). The first three occurred during his first year of imprisonment. On January 27, 1988, he was disciplined for misconduct. The second violation occurred on June 2, 1988, for possession of pruno. The third violation occurred July 9, 1988, for disobeying rules. The fourth and last violation occurred on January 15, 1994, for participation in a work strike. As to this latter violation, the Board stated it was a prison wide stoppage, and although Petitioner had a choice to participate in it, "had he not participated, he probably would have found himself in a position of being attacked or maybe even quite seriously by those who wanted this particular strike to go into effect." (Court Doc. 29, Exhibit B, Decision at 3.) The Board approximated that between 800 to 1,000 inmates participated in the strike. (Id.) Thus, at the time of the hearing, Petitioner had remained discipline free for almost 11 years. In addition, Petitioner lacks a significant history of violence, and had one prior arrest for public intoxication and driving under the influence under the age of 21. (Id; 15 Cal. Code Regs. § 2402(d)(1), (6).)

Petitioner has received *numerous* laudatory chronos from different prison staff-eight subsequent to the last hearing in 2003, which reflect his rehabilitation throughout his incarceration. (Court Doc. 29, Exhibit B at 36.) At the time of this hearing, Petitioner was employed as a correctional counselor I clerk, and his supervisor stated that was an excellent worker and had positive attitude. (Id. at 35.) Counselor Barker-has known Petitioner for approximately three years-and stated that Petitioner demonstrated "a responsible, positive attitude towards staff and inmates" and he is an example for other inmates. (Id. at 36-37.) Counselor Quentin has observed Petitioner steer youngsters into a positive direction. (Id. at 38.)

Correctional Officer Palmer stated that Petitioner demonstrated a positive attitude and his behavior is exemplary which contributes greatly to the safety and security of the facility. (Id.) Correctional Officer Garcia opined that Petitioner is "respectful, courteous and consistent, stabilizing an element in the housing unit despite serving an indeterminate sentence for life." He further stated that Petitioner "sets an example for other inmates with is conduct and positive programming and his interaction with others; inmates as well as staff. He is exemplary and deserving of commendation." (Id.) Instructor Kellenberger acknowledged all of the vocational training Petitioner has completed and indicated that he is currently working with her on developing an approved life program to assist inmates. (Id. at 39-40.) Kellengerger commended Petitioner for his continued actions of giving back to the community and believes he can become a successful member of society. (Id. at 40-41.) Correctional Officer Stabler stated that Petitioner has "exhibited the utmost respect for staff and fellow inmates. He has always been willing to assist in the housing unit to help orient new arrivals, counsel inmates if needed, answer the - - a buffer between races and/or staff when there may be tension either on the housing unit or on the facility. Mr. Trevino has been very beneficial with his positive attitude and demeanor. He should be deserving the highest consideration to be placed back into society where he would be an asset to his family and anyone that may cone in contact." (Id. at 42.) Correctional Officer Mayle opined that Petitioner interacts with both staff and inmates in an exemplary manner. His positive attitude has a calming influence on his peers and promotes a stable work environment (Id.) Correctional Officer Ochoa indicated that Petitioner talks with new arrivals to answer any questions and directs them to resources for specific problem resolutions. (Id.) He further stated that Petitioner "is to be lauded for his interests in the well being of the other inmates and commended for his self-motivated, voluntary problem solving skills." (Id. at 42-43.) Lastly, Correctional Officer Edwards commended Petitioner for his positive attitude which promotes stability within the prison population. (Id. at 43.)

      Petitioner has been an active participate in Alcoholics Anonymous and Narcotics Anonymous (AA/NA) and his counselor opined that he "fully understands his immaturity at the time of the crime and what the abuse of alcohol and drugs did to his life and the effects it had on

his family as well as the victim's family." (Id. at 46.) After considering the commitment offense, prior record, and adjustments, Petitioner's counselor opined that through his participation in self-help programming and therapy, he no longer poses a significant risk to public safety if release. (Id. at 47.)

Petitioner has participated in Anger Management, Conflict Resolution, active participant in AA and NA, Parenting Relationship Program, Ethics and Values, Healthy Relationships, Family Ties, Personal Devotion, Bible Study, Twelve Steps, Group Parenting class, Impact of Crime and Education Series, Conflict Resolution, Anger Management, one on one therapy, group therapy, marriage counseling, lifer groups, Parole Recidivism Prevention Program Series, Parenting, and Victory Education Program. (Court Doc. 29, Exhibit B, Decision at 1-2.) Petitioner further completed several vocational programs, including welding, air engines, air frame, 1, 400 hours in the automotive repair, power plant, and numerous hours in the office services program. (Id. at 2.) Petitioner has achieved his High School Diploma and Associate of Arts Degree. (Id.) Petitioner has also been involved in several extracurricular activities. He also received positive evaluations by correctional counselor's and mental health professionals.

With regard to Petitioner's social history, the Board noted that he maintained close family ties while in prison by letters, visits, and phone calls, and therefore had a stable social history. (Id. at 3.) Petitioner has maintained contact with his parents and siblings. He also maintains contact with his son and son's mother, who both visit him on a regular basis. (Court Doc. 29, Exhibit B at 21-22, 27.)

The Board concluded that Petitioner demonstrated signs of remorse and had gained sufficient insight into the commitment offense and understood the nature and magnitude of his offense. 15 Cal. Code Regs. § 2402(d)(3) ("Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.")

The psychological evaluations provided further support for Petitioner's release. The most recent psychological evaluation was conducted by Steven Walker, Ph D. Dr. Walker assessed

Petitioner to be a low likelihood of becoming involved in a violent offense if released. (Court Doc. 29, Exhibit B, Decision at 4.) Although the assessment was partially based on Petitioner's abstinence from any substance abuse, Dr. Walker further opined that "[i]t is unlikely that further substance abuse treatment programs apart from (inaudible) he is already participating will substantially contribute to a more stable and (inaudible) behavior as (inaudible) or on parole." This assessment was based on Petitioner's social background, including personal, social, and criminal history, institutional programs, community and social support, and future plans. (Id. at 5.)

Even if the Governor relied on Petitioner's prior criminality and institutional behavior, such findings are not supported by the evidence that was before the Board and do not support the conclusion that Petitioner currently remains an unreasonable risk to public safety. Petitioner did not have a significant prior criminal history which consisted of public intoxication and driving under the influence under the age of 21. There is no history of violent behavior before or after the commitment offense. Although Petitioner did appear to have a serious alcohol/drug problem prior to the commitment offense, he has since dealt with his problem through available programming and self-help therapy to the point that Dr. Walker opined further treatment apart from the present would not likely contribute to his success on parole.

Although Petitioner did not have a good start during his first year of incarceration-Petitioner was only 21-years-old at the time of the commitment offense, and was 39 years old at the time of the 2005 hearing, and the Board found his maturation and advanced age reduces the probability of recidivism pursuant to section 2402, subdivision (d)(7). (Court Doc. 29, Exhibit B, Decision at 3.) Moreover, it is noteworthy that none of the incidents resulting in a rules violation involved assaults or violent conduct. In addition, he has not suffered a rules violation since 1994-which was for participation in a work strike, and as the Board pointed out there were close to 1,000 inmates who participated in the strike and it was likely that had Petitioner not participated he would have been injured. In citing Petitioner's institutional behavior, the Governor did not articulate a nexus between Petitioner's institutional behavior that took place during his first year of incarceration-17 years prior to the 2005 hearing, to his present dangerousness. In re

Lawrence, 44 Cal.4th at 1212. The Court finds there is nothing in the record to support the Governor's finding that these four rules violations committed over a period of almost 18 years of imprisonment indicate that Petitioner poses an unreasonable risk of danger to society. This is particularly so given the superb evaluations by several different correctional officers opinions that Petitioner is a "model" inmate that is polite and courteous to all prison staff and inmates. Furthermore, at the time of the 2005, Petitioner had been in custody for almost eighteen years on a sixteen years to life sentence (almost 24 years at the time of this Findings and Recommendation), for an offense that occurred nineteen years prior and when he was 21 years old. In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Although a denial of parole initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), *citing* Biggs, 334 F.3d at 916. Nevertheless, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole because in each of these cases the prisoner had not yet served the minimum term of his sentence.

In this case, Petitioner has served beyond his minimum term and has shown substantial in-prison rehabilitation to the point that the circumstances of the commitment offense, institutional behavior, and prior criminal history are no longer a predictive value of his present dangerousness, and based on reasoning of the Board he is suitable for release. Indeed, in the words of Presiding Commissioner Angele, "Mr. Trevino, I'll tell you, the crime is never going to change. No matter what you do or we do, that's always going to be there, so anything you've done prior to coming to prison, the only thing you can change is you. You've done a lot. You've always (inaudible) [done] whatever the Board has asked you to do. You've accomplished quite a bit[.] . . ." (Court Doc. 29, Exhibit B, Decision at 8.)

In sum, after considering the record as a whole, including Petitioner's acceptance of

responsibility, prison disciplinary record consisting of no violent violations and the last occurring almost 11 years prior, substantial participation in self-help programming and therapy, solid parole plans, and exemplary evaluations by prison staff, this Court finds that the circumstances of Petitioner's commitment offense have diminished to the degree of no predicative value of his present dangerousness, and there is not some evidence to support the Governor's finding of unsuitability for release. Accordingly, the state court's conclusion that the commitment offense constituted "some evidence" to support the Governor's decision constituted an unreasonable application of Hill, 472 U.S. at 454-455, 457, and the instant petition for writ of habeas corpus should be granted.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be GRANTED;
2. The Governor's decision reversing the Board 2005 decision be VACATED;
3. The Board's 2005 finding of suitability for release on parole be reinstated;
4. Respondent be directed to release Petitioner from custody within 10 days of any order adopting this findings and recommendation, with Petitioner subject to the terms and conditions set by the Board[2]; and
5. Respondent be directed to file, within 10 days of Petitioner's release, a notice with the court confirming the date upon which Petitioner was released.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and

---

[2] At the 2005 hearing, the Board calculated Petitioner's term and assessment a total confinement of 240 months, less post-conviction credits of 63 months, for a total confinement of 177 months. As of that hearing Petitioner had already served approximately 213 months. Therefore, it is not necessary to refer the matter back to the Board to set a term.

14

filed within fourteen (14) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     February 4, 2010**                           **/s/ Dennis L. Beck**
                                                                            UNITED STATES MAGISTRATE JUDGE